RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2003 FED App. 0130P (6th Cir.)
File Name:  03a0130p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

02-5165 through 02-5175
BRIDGEPORT MUSIC, INC., et al.,

      *Plaintiffs-Appellants,*

        *v.*

STILL N THE WATER
PUBLISHING, et al.,
      *Defendants-Appellees.*

02-5227 through 02-5234
BRIDGEPORT MUSIC, INC., et al.,

      *Plaintiffs-Appellants,*

        *v.*

DM RECORDS, INC., et al.,
      *Defendants-Appellees.*

Nos. 02-5165
through 02-5175;
02-5227 through
02-5234

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
Nos. 01-00707/749/750/860/869/881/905/964;
01-01093/94/128; 01-00730/827/832/842/856/946;

1

2    *Bridgeport Music, et al.*    Nos. 02-5165 - 02-5175;
     *v. Still N the Water*      02-5227 - 02-5234
     *Publishing, et al.*

01-01028/53—Thomas A. Higgins, Todd J. Campbell,
District Judges.

Argued and Submitted:  October 29, 2002

Decided and Filed:  May 5, 2003

Before:  KEITH and DAUGHTREY, Circuit Judges;
KATZ, District Judge.[*]

_____

## COUNSEL

**ARGUED:**  Richard S. Busch, KING & BALLOW, Nashville, Tennessee, for Appellants.  Henry J. Fasthoff IV, STUMPF, CRADDOCK, MASSEY & PULMAN, Houston, Texas, for Appellees.  **ON BRIEF:**  Richard S. Busch, D'Lesli M. Davis, Virginia F. Flack, KING & BALLOW, Nashville, Tennessee, for Appellants.  Henry J. Fasthoff IV, STUMPF, CRADDOCK, MASSEY & PULMAN, Houston, Texas, Mary Ellen Morris, MILLER & MARTIN, Nashville, Tennessee, Elena J. Xoinis, DODSON, PARKER, DINKINS & BEHM, Nashville, Tennessee, Karl M. Braun, HALL, BOOTH, SMITH & SLOVER, Nashville, Tennessee, for Appellees.

_____

## OPINION

_____

PER CURIAM  Plaintiffs-Appellants Bridgeport Music, Inc., Southfield Music, Inc., Westbound Records, Inc., and Nine Records, Inc. (collectively "Bridgeport") appeal the

_____

[*] The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation.

Nos. 02-5165 - 02-5175;    *Bridgeport Music, et al.*    3
02-5227 - 02-5234                      *v. Still N the Water*
                                      *Publishing, et al.*

district court's dismissal of eleven individual actions for lack of personal jurisdiction over Defendants-Appellees N-the-Water Publishing, Inc., individually and d/b/a Still N the Water Publishing (collectively "NTW").[1] Bridgeport also appeals the dismissal of eight individual actions filed against Defendants-Appellees DM Records, Inc., individually and a/s/t Bellmark Records (collectively "DM"). For the reasons set forth below, we **AFFIRM** the district court's order granting NTW's motion to dismiss for lack of personal jurisdiction, but **REVERSE** the ruling as to DM and **REMAND** for further findings.

## I. BACKGROUND

This action is one of several hundred filed by Appellants against entities and/or individuals associated with the "rap" or "hip-hop" music industry. Appellants are all Michigan corporations engaged in, *inter alia*, music publishing, recording and distributing sound recordings, and other forms of commercial exploitation of musical copyrights. On May 4, 2001, Appellants filed suit alleging infringement upon their copyrights in several sound recordings and musical compositions through "sampling" of Appellants' recordings and/or compositions in subsequent recordings, compositions,

---

[1] NTW is one music publishing company operating under two distinct names, N-the-Water Publishing, Inc. and N-the-Water Publishing, Inc. d/b/a Still N the Water Publishing, Inc. The two arms of the company are named as distinct defendants, but the companies conduct the same business, have the same ownership, and have submitted joint motions and briefs. The only apparent distinction between the two companies is that they affiliate with different performing rights organizations ("PROs"). N-the-Water Publishing affiliates with the American Society of Composers, Authors and Publishers ("ASCAP"), while Still N the Water Publishing affiliates with Broadcast Music, Inc. ("BMI").

4    *Bridgeport Music, et al.*    Nos. 02-5165 - 02-5175;
     *v. Still N the Water*            02-5227 - 02-5234
     *Publishing, et al.*

and performances.[2] The original complaint, *Bridgeport Music, Inc. v. 11C Music*, No. 3:01-0412 (M.D. Tenn. 2001), asserted nearly 500 claims against approximately 800 defendants seeking declaratory judgment, injunctive relief, and damages for infringement and violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq*. On July 25, 2001 the district court severed the case by count into 476 cases, resulting in the filing of numerous amended complaints based on different allegedly infringing musical compositions and/or sound recordings.[3]

On September 28, 2001 Appellants filed an amended complaint naming Appellee DM as a defendant in eight of the newly severed cases.[4] On October 1, 2001, Appellants filed

---

[2] As used in the context of this litigation, "sampling" is the process of copying portions of prior master sound recordings directly onto new sound recordings and then rapping on top of the new sound recording. J.A. 14. The allegedly infringing samples in the instant action are asserted to be used in rap records and contain elements of Bridgeport/Southfield compositions and/or Westbound/Nine Record recordings, such as synthesizer, rhythm background, piano, horn, vocals, or drums.

[3] A musical composition consists of rhythm, harmony, and melody. *See* 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 2.05[D]. As described by Appellees, a musical composition "is a particular sequence and arrangement of lyrics and/or music that comprise what most people refer to as a 'song.'" Under the copyright act, "'sound recordings' are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work ." 17 U.S.C. § 101. Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights. *See* 17 U.S.C. § 102 (a)(2), (7).

[4] The eight allegedly infringing compositions and corresponding appellate case numbers are as follows:

    (1)  No. 02-5227, "BOBY AHEAD a/k/a/ Bobyahead," in which DM allegedly owns the administrative rights and possibly

Nos. 02-5165 - 02-5175;     *Bridgeport Music, et al.*     5
02-5227 - 02-5234              *v. Still N the Water*
                              *Publishing, et al.*

an amended complaint naming Appellee NTW as a defendant in eleven of the newly severed cases.[5]

        owns part of the copyright, contained on DM's sound recording "The Best of Tag Team."

(2) No. 02-5228, "Fool Get A Clue," in which DM allegedly owns the administrative rights and possibly owns part of the copyright, contained on the "Future Rhythm" and "Fool Get A Clue" recordings.

(3) No. 02-5229, "Freestyle," in which DM allegedly owns the administrative rights and possibly owns part of the copyright, contained on "Best of Tag Team."

(4) No. 02-5230, "Funky Situation / Back From Another Mission," contained on DM's release, "The Best of Tag Team."

(5) No. 02-5231, "Get Nasty," in which DM allegedly owns the administrative rights and possibly owns part of the copyright.

(6) No. 02-5232, "It's Somethin'," in which DM allegedly owns the administrative rights and the copyright, contained on "The Best of Tag Team."

(7) No. 02-5233, "Oregano Flow," on DM's re-release "Future Rhythm" and/or "Fool Get a Clue."

(8) No. 02-5234, "Pump It," on DM's release "Super Quad."

Appellants' Br. at 10, n.5.

[5]The eleven allegedly infringing compositions and corresponding appellate case numbers are as follows:

(1)      No. 02-5165, Aggravated Monkeys.
(2)      No. 02-5166, Buddah Nature.
(3)      No. 02-5167, Bumbell.
(4)      No. 02-5168, Getos in the Mind.
(5)      No. 02-5169, Good Girl Gone Bad.
(6)      No. 02-5170, Havin' Thangs.
(7)      No. 02-5171, I Ain't Going Back.
(8)      No. 02-5172, Lettin' Em Know.
(9)      No. 02-5173, Straight Gangstaism.
(10)    No. 02-5174, Straight Madness.
(11)    No. 02-5175, Two to the Head.

Appellants' Br. at 11, n.5; *see also* JA 86-88.

6     *Bridgeport Music, et al.*     Nos. 02-5165 - 02-5175;
      *v. Still N the Water*          02-5227 - 02-5234
      *Publishing, et al.*

NTW is a Texas corporation with its principal place of business in Texas. As a music publisher, NTW's business consists primarily of owning and exploiting musical compositions through mechanical licensing.[6] Appellants assert that NTW has infringed on their musical composition copyrights by licensing infringing works, as well as by sampling certain protected compositions and distributing the infringing compositions and sound recordings in Tennessee and elsewhere.

DM is a family-owned and operated independent record company located in Florida that produces and distributes sound recordings. It acquires copyrights, distributes sound recordings, and engages in publishing, administration of copyrights, and licensing. Appellants assert that DM has infringed on their copyrights by sampling certain protected compositions and distributing the infringing compositions and sound recordings in Tennessee and elsewhere.

On July 9, 2001, NTW moved to dismiss all eleven actions asserted against it for lack of personal jurisdiction and improper venue and renewed the motion post-severance. On October 22, 2001, DM moved to dismiss for lack of personal jurisdiction, improper venue, and failure to state a claim upon which relief can be granted. The district court granted the parties a limited time to conduct jurisdictional discovery, but did not conduct a hearing on either NTW or DM's motions to dismiss.

In January 2002 the district court granted NTW's motion and between January 18 and January 29 entered dismissal orders in the 11 NTW actions for lack of personal jurisdiction. On January 29, 2002, the district court granted

[6]Under a typical license agreement, a publisher's compositions are incorporated into a record label's sound recordings. A "mechanical royalty" is the royalty generated from sales of the sound recording.

Nos. 02-5165 - 02-5175;     *Bridgeport Music, et al.*     7
02-5227 - 02-5234                   *v. Still N the Water*
                                            *Publishing, et al.*

DM's motion and dismissed the eight actions for lack of personal jurisdiction. The district court therefore denied as moot the motions to dismiss for improper venue and failure to state a claim. The district court denied Appellants' subsequent motion for reconsideration and entered final judgment on the claims asserted against DM and NTW pursuant to Federal Rule of Civil Procedure 54(b). On February 15, 2002, Bridgeport filed suit against NTW in Houston, Texas, *Bridgeport Music, Inc. v. N-The-Water Publishing, Inc.*, No. 02-0585 (S.D. Tex. filed Feb. 15, 2002), based primarily on the same facts alleged in the instant action.

## II. DISCUSSION

### A. Standard of Review

"The decision to exercise personal jurisdiction is a question of law based on the Due Process Clause of the Constitution." *Tobin v. Astra Pharm. Prods., Inc.*, 993 F.2d 528 (6th Cir. 1993) (citing *Burger King Corp. v. Rudewicz*, 471 U.S. 462, 471-72 (1985)). As a question of law, this Court reviews *de novo* the district court's determination as to personal jurisdiction. *See id.*

### B. Personal Jurisdiction Standard

"Where a federal court's subject matter jurisdiction over a case stems from the existence of a federal question, personal jurisdiction over a defendant exists 'if the defendant is amenable to service of process under the [forum] state's long-arm statute and if the exercise of personal jurisdiction would not deny the defendant[] due process.'" *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002) (citation omitted). Where the state long-arm statute extends to the limits of the due process clause, the two inquiries are merged and the court need only determine whether exercising personal jurisdiction violates constitutional due process. *See Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co., Ltd.*, 91 F.3d 790, 793 (6th Cir. 1996). As

8     *Bridgeport Music, et al.*     Nos. 02-5165 - 02-5175;
      *v. Still N the Water*                    02-5227 - 02-5234
      *Publishing, et al.*

"[t]he Tennessee long-arm statute has been interpreted as coterminous with the limits on personal jurisdiction imposed by the due process clause,"[7] *Payne v. Motorists' Mut. Ins. Cos.*, 4 F.3d 452, 454 (6th Cir. 1993), we address only whether exercising personal jurisdiction over Appellees is consistent with federal due process requirements.

"Personal jurisdiction can be either general or specific, depending upon the nature of the contacts that the defendant has with the forum state." *Bird*, 289 F.3d at 873. In the instant action, the district court ruled as to both general and specific jurisdiction, finding both lacking against DM and NTW. On appeal, Bridgeport challenges the district court's findings only as to specific jurisdiction. Specific jurisdiction is proper over Appellees only if their contact with Tennessee satisfies the three-part test established in *Southern Machine Company v. Mohasco Industries, Inc.*:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequence caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

401 F.2d 374, 381 (6th Cir. 1968).

In the instant action, the district court concluded that neither NTW nor DM had purposefully availed themselves of the privilege of acting in or causing a consequence in the forum state and therefore found personal jurisdiction lacking over both NTW and DM. Having made that determination,

---

[7] Under Tennessee's long-arm statute, jurisdiction may be asserted on "any basis not inconsistent with the constitution of this state or of the United States." TENN. CODE ANN. § 20-2-214(a)(6).

Nos. 02-5165 - 02-5175;      *Bridgeport Music, et al.*      9
02-5227 - 02-5234                        *v. Still N the Water*
                                                    *Publishing, et al.*

the district court did not make findings as to the remaining two elements of the *Mohasco* test. On appeal, the parties chiefly dispute the district court's purposeful availment findings, but also present arguments as to the remaining *Mohasco* factors. However, because the district court did not address these factors, and because the appellate record does not lend itself to a ruling on these factors as to each of the 18 individual actions before the Court, we address only the district court's purposeful availment determination.

The district court did not conduct an evidentiary hearing, and we therefore review the pleadings and other documentary evidence in a light most favorable to Bridgeport without considering Appellees' controverting assertions. *See Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000). "'Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff . . . alleges collectively fail to state a prima facie case for jurisdiction.'" *Kerry Steel, Inc. v. Paragon Indus.*, 106 F.3d 147, 149 (6th Cir. 1997) (quoting *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991)). As plaintiff, Bridgeport bears the burden of establishing jurisdiction, *see Tobin*, 993 F.2d at 543, but need only made a prima facie showing. *See Calphalon*, 228 F.3d at 721.

### C.   Purposeful Availment

Under the first prong of the *Mohasco* test, Appellants must establish that Appellees purposefully availed themselves of the privilege of acting in Tennessee or causing a consequence in Tennessee. "'[P]urposeful availment is something akin to a deliberate undertaking to do or cause an act or thing to be done in [the forum state] or conduct which can be properly regarded as a prime generating cause of the effects resulting in [the forum state], something more than a passive availment of [the forum state's] opportunities." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 891 (6th Cir. 2002) (internal citation and quotation omitted). "The 'purposeful

10      *Bridgeport Music, et al.*      Nos. 02-5165 - 02-5175;
         *v. Still N the Water*                          02-5227 - 02-5234
         *Publishing, et al.*

availment' requirement is satisfied when the defendant's contacts with the forum state 'proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State,' and when the defendant's conduct and connection with the forum are such that he 'should reasonably anticipate being haled into court there.'" *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir. 1996) (quoting *Burger King*, 471 U.S. at 474-75). The "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Burger King*, 471 U.S. at 475 (internal citation omitted); *see also Lak, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1300 (6th Cir. 1989). The emphasis in the purposeful availment inquiry is whether the defendant has engaged in "some overt actions connecting the defendant with the forum state." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1274 (6th Cir. 1998). If a plaintiff can demonstrate purposeful availment, the absence of physical contacts with the forum state will not defeat personal jurisdiction over a non-resident defendant. *See Burger King*, 471 U.S. at 476; *CompuServe*, 89 F.3d at 1265.

### 1.   Stream of commerce "plus" theory

As a preliminary matter, we note that in the instant action, the district court, as well as the parties on appeal, presume that this Circuit has adopted Justice O'Connor's approach to purposeful availment as articulated in *Asahi Metal Industry Company, Ltd. v. Superior Court*, 480 U.S. 102 (1987) (O'Connor, J.) (plurality op.). In *Asahi*, which reflects the Supreme Court's most recent discussion of purposeful availment, the Court debated whether a foreign manufacturer that places a product in the stream of commerce purposefully avails itself of the privilege of conducting business in a state where the product ultimately is found. In her plurality opinion, which embraces what has come to be known as the "stream of commerce 'plus'" theory, Justice O'Connor opined

Nos. 02-5165 - 02-5175;    *Bridgeport Music, et al.*    11
02-5227 - 02-5234              *v. Still N the Water*
                                  *Publishing, et al.*

that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Asahi*, 480 U.S. at 112. Although a majority of the *Asahi* Court agreed that jurisdiction was not proper, Justice O'Connor secured only three other justices to join in her articulation of a stream of commerce "plus" theory. *See id.* at 116-22.

While some appellate courts have expressly adopted one of *Asahi's* conflicting conceptions of minimum contacts via the stream of commerce, most circuits, including the Sixth Circuit, have avoided explicitly articulating a preference. *See, e.g.*, *Pennzoil Prods. Co. v. Colelli & Assocs.*, 149 F.3d 197 (3d Cir. 1999) (declining to expressly adopt any of the *Asahi* plurality positions); *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 613-15 (8th Cir. 1994) (adopting a position consistent with that of Justice Brennan); *Ruston Gas Turbines, Inc. v. Donaldson Company*, 9 F.3d 415, 420 (5th Cir. 1993) (same); *Boit v. Gar-Tec Products, Inc.*, 967 F.2d 671, 683 (1st Cir. 1992) (adopting a position consistent with that of Justice O'Connor); and *Madara v. Hall*, 916 F.2d 1510, 1519 (11th Cir. 1990) (same); *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1548 (11th Cir. 1993) ("Because jurisdiction . . . over [the defendant] in this case . . . is consistent with due process under the more stringent 'stream of commerce plus' analysis adopted by the [O'Connor] plurality, we need not determine which standard actually controls this case"); *Madara v. Hall*, 916 F.2d 1510, 1519 (11th Cir. 1990) (concluding that exercise of jurisdiction must satisfy the test articulated by the O'Connor plurality).

Although this Circuit thusfar has avoided expressly adopting a position, the only published opinions in our Circuit directly addressing the issue, albeit admittedly in dicta, express a leaning toward Justice O'Connor's approach. In *CompuServe*, we noted that the "injection of . . . [a] product into the stream of commerce, without more, would be at best a dubious ground for jurisdiction." *See CompuServe*, 89 F.3d

12    *Bridgeport Music, et al.*      Nos. 02-5165 - 02-5175;
      *v. Still N the Water*               02-5227 - 02-5234
      *Publishing, et al.*

at 1265. In *Tobin*, the court did not expressly adopt Justice O'Connor's stream of commerce "plus" test, but did cite with approval from Justice O'Connor's opinion and acknowledged without rebuke that the district court had relied heavily on Justice O'Connor's opinion. *See Tobin*, 993 F.2d at 543.

In the instant action, the parties do not call upon the Court to adopt one *Asahi* approach over the other, and thus it is tempting once again to defer committing to one particular approach. However, unlike other instances in which an analysis under all three *Asahi* approaches would yield the same result, thus permitting avoiding establishing a clear rule, the facts in the instant action, particularly under the relaxed prima facie standard, would seem to dictate different results under the three *Asahi* plurality approaches. Therefore, instead of undertaking the time-consuming task of analyzing the facts under all three approaches, and then being left to select an approach based upon the end result, we make clear today our preference for Justice O'Connor's stream of commerce "plus" approach, for the reasons set forth in that opinion, and conduct the remainder of our analysis accordingly.

### 2. *Purposeful availment as to NTW*

#### a. *Licensing and royalties*

To show purposeful availment by NTW, Bridgeport first argues that NTW issued mechanical licenses to Rap-A-Lot Records ("RAL") and other entities for allegedly infringing compositions and has received royalties therefrom. Bridgeport asserts that in relation to these mechanical licenses, NTW has a financial interest in RAL selling as many records as possible that contain NTW's compositions, NTW does not desire to limit exploitation of its compositions to a "less-than-national" market, NTW has no objection to NTW's compositions being sold in Tennessee, and NTW knows that RAL distributes nationally and is likely to exploit NTW's compositions throughout the entirety of the United Sates,

Nos. 02-5165 - 02-5175;    *Bridgeport Music, et al.*    13
02-5227 - 02-5234              *v. Still N the Water*
                                     *Publishing, et al.*

including in Tennessee. Based on the rationale set forth in *Tobin*, Bridgeport argues that the foregoing conduct constitutes purposeful availment.

In *Tobin*, the court found purposeful availment based on the existence of a nationwide distribution agreement. The agreement required the defendant distribution company, Astra, to distribute the drug rotidrine on behalf of defendant manufacturer, Duphar, throughout Astra's territory. The relevant agreement defined the distribution territory as "the United States of America, its territories and possessions, and Puerto Rico." *Tobin*, 993 F.2d at 543 (explaining that a manufacturer cannot insulate itself from suit merely by using an independent national distributor to market its products).

In contrast to *Tobin*, NTW's contacts with Tennessee in the instant action lack the additional element present in *Tobin*, chiefly, the fact that the *Tobin* defendants were not merely aware that their distributor was likely to market the product in all fifty states; rather, the parties' contract required it. Unlike in *Tobin*, Bridgeport does not assert that NTW entered into a distribution agreement with RAL or any other party that placed an affirmative obligation upon the third party to distribute NTW's compositions in Tennessee or elsewhere. Bridgeport even concedes in its brief that with respect to the RAL-NTW licensing, "[h]ow the subject composition is exploited is 'pretty much out of [NTW's] hands.'" NTW's knowledge that RAL was likely to distribute NTW's compositions nationally, coupled with its lack of objection to Tennessee sales, if such sales were ever to occur, is insufficient conduct upon which to predicate purposeful availment.

As further support for its position, Bridgeport asserts that allegedly infringing NTW compositions on RAL sound recordings have been sold by at least two Nashville, Tennessee retailers. However, Bridgeport does not adduce any evidence that NTW took any actions to direct the

14   *Bridgeport Music, et al.*       Nos. 02-5165 - 02-5175;
       *v. Still N the Water*              02-5227 - 02-5234
       *Publishing, et al.*

compositions to Tennessee. Rather, Bridgeport asserts that NTW does not doubt that such sales have occurred and does not object to Tennessee distribution and sales. Bridgeport makes similar arguments with respect to a synchronization licence related to the film "Dangerous Minds."[8] However, as with the mechanical licenses, the Court finds these contacts too random, fortuitous, and attenuated for a finding of purposeful availment.

### b.   *Advertising*

Bridgeport asserts that NTW has engaged in advertising and marketing activities directed at Tennessee and that these activities require a finding of purposeful availment. Bridgeport also argues that RAL advertises nationally, including in Tennessee, "on behalf of and to the financial benefit of NTW" on national television and radio spots, and in national magazines. Appellants' Br. at 16. As evidence of NTW's marketing activities, NTW points to a single statement from the deposition of Mr. Bruce Toval, NTW's CEO, that "[w]e attempt to market nationally."[9]

---

[8] "Synchronization" is the process of combining sound recordings of musical compositions with visual images. A "synchronization license" is a license for use of a composition in a film, pre-recorded radio or television program, or radio or television commercial. *See* 2 LINDEY ON ENTERTAINMENT, PUBLISHING AND THE ARTS § 7.01 (2d ed. 2000). Under copyright law, an entity wishing to synchronize music with visual images in a video, motion picture, etc., must obtain a synchronization license from the musical composition copyright holder and must also obtain a license from the sound recording copyright holder.

[9] The record also reflects that Mr. Toval was asked earlier in his deposition if NTW "undertake[s] any form of advertising or marketing to encourage exploitation of its musical compositions." Unfortunately, the pages of the deposition containing Mr. Toval's response to that question have not been made part of the joint appendix.

Nos. 02-5165 - 02-5175;    *Bridgeport Music, et al.*    15
02-5227 - 02-5234              *v. Still N the Water*
                              *Publishing, et al.*

Although it has been established in this Circuit that "[a]dvertising is among the activities that constitute 'reaching out' to forum state residents," *Creech v. Roberts*, 908 F.2d 75, 79 (6th Cir. 1990) (citing *LAK*, 885 F.2d at 1300), the instant record does not support a finding of purposeful availment based upon a single statement that NTW "attempts to market nationally."[10]   The record does not contain any evidence of advertising directly targeting or even actually reaching Tennessee.  Nor does the record reflect the extent and nature of NTW's advertising.   Moreover, Bridgeport does not actually adduce any evidence that RAL undertook advertising expressly on NTW's behalf, nor does Bridgeport provide any basis on which to impute RAL's conduct to NTW.

### c.   *NTW's contract with Bluewater*

Appellants' assertions as to NTW's contract with Bluewater, a Tennessee corporation, require a brief departure from the Court's purposeful availment analysis.  Bridgeport asserts that NTW's contract with Tennessee-based Bluewater is sufficient for a finding of personal jurisdiction because the contract is with a Tennessee entity and contains choice of law and venue provisions relating to Tennessee.  NTW does not dispute that it contracted with Bluewater to collect foreign

---

[10]We take no position today as to whether, post-*Asahi*, evidence of nationwide advertising is sufficient for a finding of purposeful availment, but note that at least two of our sister circuits have determined that such conduct is insufficient. *See Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1305 (10th Cir. 1994) ("evidence of mere placement of advertisements in nationally distributed papers or journals does not rise to the level of purposeful contact with a forum required by the Constitution in order to exercise personal jurisdiction over the advertiser"); *Singletary v. B.R.X., Inc.*, 828 F.2d 1135, 1136 (5th Cir. 1987) ("advertising in national publications is not in itself sufficient to subject a defendant to personal jurisdiction"); *but see United States SEC v. Carrillo*, 115 F.3d 1540, 1545 (11th Cir. 1999) ("advertising that is reasonably calculated to reach the forum may constitute purposeful availment of the privileges of doing business in the forum").

16    *Bridgeport Music, et al.*    Nos. 02-5165 - 02-5175;
      *v. Still N the Water*              02-5227 - 02-5234
      *Publishing, et al.*

royalties related to NTW's compositions or that the contract contained a choice of law and venue provisions designating Tennessee law and venue.  Appellees do, however, complain that Bridgeport did not assert this matter before the district court and thus that it is not appropriate for consideration on appeal.

As to the Bluewater contract, the district court did not make a finding as to purposeful availment and instead, in a footnote, indicated that the contract could not serve as a basis for jurisdiction because Bridgeport did not assert that the contract is related to the infringement action against NTW. Bridgeport for the first time on appeal now makes such arguments, arguments which we decline to address.  *See Preferred RX v. Am. Prescription Plan*, 46 F.3d 535, 549 (6th Cir. 1995) ("subject to limited exceptions, this court will not consider issues not presented to the district court but raised for the first time on appeal"); *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 143 (6th Cir. 1997) (explaining that the "court will not consider arguments raised for the first time on appeal unless our failure to consider the issue will result in a plain miscarriage of justice").  We find no basis to depart from this principle in the instant action.

### d.   *NTW's affiliation with ASCAP and BMI*

With respect to NTW's affiliation with ASCAP and BMI, Bridgeport cites the following conduct in support of purposeful availment: (1) NTW initially affiliated with ASCAP and BMI through the PROs' Tennessee offices; (2) the PROs collect royalties, monitor performances, and perform enforcement functions on behalf of their members; and (3) NTW licensed its entire music composition catalog to ASCAP and BMI, which in turn re-licensed these compositions to third parties.

Nos. 02-5165 - 02-5175;    *Bridgeport Music, et al.*    17
02-5227 - 02-5234               *v. Still N the Water*
                                        *Publishing, et al.*

18    *Bridgeport Music, et al.*    Nos. 02-5165 - 02-5175;
       *v. Still N the Water*               02-5227 - 02-5234
       *Publishing, et al.*

With respect to the collection, monitoring, enforcement, and licensing activities, the record does not support a finding of purposeful availment. As with the mechanical licenses granted to RAL, the record does not reflect that BMI or ASCAP have any affirmative duty to license or market the subject compositions specifically in Tennessee or even nationally. As to the royalty collection, monitoring, and enforcement functions, the nature of these functions has not been submitted with sufficient clarity to the Court as to permit a purposeful availment finding.

With respect to the initial contractual affiliation with the PROs through the Tennessee offices of these organizations, in analyzing whether contractual relationships are sufficient to confer specific jurisdiction, the Court focuses on the actions of the defendant in the negotiation and performance of the contract to determine whether it should be subject to suit in the forum state. *See Nationwide*, 91 F.3d at 795. As explained in *Nationwide*:

> [T]he existence of a contract with a citizen of the forum state, standing alone, will not suffice to confer personal jurisdiction over a foreign defendant. Rather, "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum."

*Id.* at 795 (internal citation omitted).

As to these factors, Bridgeport does not assert that NTW had any type of substantial contacts or negotiations specifically with the Tennessee offices of BMI and ASCAP, that the contracts' terms contained Tennessee forum or venue selection clauses, or that the parties' course of dealing implicated conduct in the Tennessee forum, other than by way of initial affiliation and the collection of royalties for songs performed in Tennessee. Bridgeport even notes that after initial affiliation, NTW's contact with BMI and ASCAP was maintained through offices not based Tennessee. Based on the foregoing, we cannot find that NTW's "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" support a finding of purposeful availment.

### e.    Internet sales

In this Circuit, "operation of an Internet website can constitute the purposeful availment of the privilege of acting in a forum state under the first *Mohasco* factor 'if the website is interactive to a degree that reveals specifically intended interaction with residents of the state.'" *Bird*, 289 F.3d at 874 (quoting *Neogen*, 282 F.3d at 890). Bridgeport asserts that NTW allows and expects its compositions to be sold on the internet and thus has availed itself of doing business in Tennessee. However, Bridgeport does not assert that NTW hosts or operates a website, let alone one that is sufficiently interactive for a finding a purposeful availment. Even under the more relaxed prima facie standard, Bridgeport's arguments are insufficient to establish purposeful availment as the result of internet activity.

### f.    Summary of purposeful availment analysis as to NTW

As none of the foregoing factors support exercising specific personal jurisdiction over NTW, the Court affirms the district court's dismissal of all 11 actions against NTW.

### 3.    Purposeful availment as to DM

As with NTW, the district court concluded that DM did not purposefully avail itself of the forum state and found personal jurisdiction lacking. On appeal, Bridgeport sets forth numerous reasons as to why DM has purposefully availed

Nos. 02-5165 - 02-5175;     *Bridgeport Music, et al.*     19
02-5227 - 02-5234                   *v. Still N the Water*
                                             *Publishing, et al.*

itself of the Tennessee forum. We find two of these arguments persuasive and dispositive as to a finding of purposeful availment and thus do not address the remainder of Appellants' arguments.

### a. Nationwide distribution agreement between DM and Ryco

The record reflects that DM entered into a distribution contract with Ryco Distribution Partners ("Ryco") in which DM sought nationwide distribution of its records throughout "the United States, its territories, commonwealth, possessions . . . ." Relying upon *Tobin*, Bridgeport asserts that this nationwide distribution agreement is sufficient for a finding of purposeful availment.

In *Tobin*, the Court indeed found purposeful availment based on the existence of a nationwide distribution agreement. Saliently, the territory in the *Tobin* distribution agreement was defined as "the United States of America, its territories and possessions, and Puerto Rico." *Tobin*, 993 F.2d at 543. Although in *Tobin* we mentioned a number of factors supporting our finding of purposeful availment, the primary emphasis of the opinion is on the "deliberate decision [Duphar made] to market ritodrine in all 50 states," as opposed to seeking only a regional distribution agreement. *Id.* We found purposeful availment, even though Duphar did "nothing in particular to purposefully avail itself of the Kentucky market as distinguished from any other state in the union." *Id.* at 544.

In the instant action, DM does not explicitly admit that it affirmatively required Ryco to distribute its records throughout the foregoing territory. However, DM does admit, via deposition testimony of DM's president Mark Watson, that his understanding was that DM's recordings would be distributed nationwide, "in all 50 states" pursuant to the parties' agreement. J.A. 71. The language in the DM-Ryco

20     *Bridgeport Music, et al.*     Nos. 02-5165 - 02-5175;
         *v. Still N the Water*                 02-5227 - 02-5234
         *Publishing, et al.*

agreement is nearly identical to that in *Tobin*, and viewing the facts in a light most favorable to Appellants, the Court finds that the foregoing supports a prima facie purposeful availment finding.[11]

### b. DM's website and internet sales

As further support for a finding of purposeful availment, Bridgeport notes that DM operates a website, dmrecords.com, through which users can access DM's catalog and purchase DM's records. Through the DM site, users select a recording of choice and then are redirected to Amazon.com to complete their purchases.

As indicated *supra*, "operation of an Internet website can constitute the purposeful availment of the privilege of acting in a forum state under the first *Mohasco* factor 'if the website is interactive to a degree that reveals specifically intended interaction with residents of the state.'" *Bird*, 289 F.3d at 874 (quoting *Neogen*, 282 F.3d at 890). In *Bird*, the court concluded "that by maintaining a website on which Ohio residents can register domain names and by allegedly accepting the business of 4,666 Ohio residents, the Dotster defendants have satisfied the purposeful-availment requirement." *Id.* The defendants in *Bird* operated a website through which users could register domain names and the plaintiff merely seized on defendants' admission that they processed 333,333 Internet domain-name registrations. Plaintiffs then estimated a number of sales that were likely to

---

[11]The distinction that the Court finds between DM and NTW is twofold. First, no contract language is presented to the Court as to the NTW-RAL distribution agreement. Second, Bridgeport does not set forth sufficient facts as to NTW to find that NTW actually required RAL or any other party to market, distribute, or license NTW's compositions nationally, in Tennessee specifically, or elsewhere. If such is the nature of the relationship between NTW and RAL, that fact is not discernible from the record before the Court.

Nos. 02-5165 - 02-5175;     *Bridgeport Music, et al.*    21
02-5227 - 02-5234         *v. Still N the Water*
                            *Publishing, et al.*

have occurred in Ohio. According to Bird, 70% of the defendants' sales occurred in the U.S. Bird then divided the 70% of the 333,333 sales equally among the 50 states, which resulted in the conclusion that 4,666 transactions involved an Ohio resident. Specifically noting that it "must draw all permissible inferences in favor of Bird at this stage of the proceedings, because no evidentiary hearing or discovery has occurred," *id.* at 872, the *Bird* court regarded the foregoing "evidence" as sufficient to establish purposeful availment.

In the instant action, as in *Bird*, there is evidence indicating the volume of business DM conducts through the internet for at least two of the allegedly infringing albums, *i.e.*, 36 internet sales of Tag Team and 30 of Future Rhythm. The facts are not clear regarding the number of Amazon.com sales that might have originated by linking through the DM website, but viewing the cumulative facts in Appellants' favor, we conclude that Bridgeport has adduced evidence sufficient to support a prima facie finding of purposeful availment.

### 4. *Remaining Mohasco factors*

Although Appellants urge us to proceed beyond the district court's purposeful availment analysis and announce that jurisdiction is proper, we decline to do so in the instant action. The remaining two prongs of the *Mohasco* test often implicate a fact-intensive analysis, and the appellate record is not sufficiently developed to permit us to determine, relative to each of the eight individual actions asserted against DM, whether DM's activities in the forum state are sufficiently related to each of the actions to support personal jurisdiction. This matter is more appropriately determined by the district court on remand.

### III. CONCLUSION

Based on the foregoing, we **AFFIRM** the district court's order granting NTW's motion to dismiss for lack of personal

22    *Bridgeport Music, et al.*     Nos. 02-5165 - 02-5175;
     *v. Still N the Water*               02-5227 - 02-5234
     *Publishing, et al.*

jurisdiction. However, we **REVERSE** the district court's purposeful availment determination as to DM and **REMAND** appellate Case Nos. 02-5227 – 02-5234 for further findings as to the propriety of exercising specific personal jurisdiction over DM.